UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

SS&C TECHNOLOGIES HOLDINGS, INC., and   :
ADVENT SOFTWARE, INC.,   :       Civil Case No: 22-cv-2009
  :
        Plaintiffs,   :
    v.   :
  :       **<u>COMPLAINT</u>**
ARCESIUM LLC,   :
  :       **JURY TRIAL**
      Defendant.   :       **DEMANDED**
  :
  :

------------------------------------------------------------ x

      Plaintiffs SS&C Technologies Holdings, Inc. ("SS&C Technologies") and Advent Software, Inc. ("Advent," and collectively with SS&C Technologies, "SS&C"), by its attorneys, Shearman & Sterling LLP, for its Complaint against Defendant Arcesium LLC ("Arcesium"), allege as follows:

## <u>NATURE OF THE ACTION</u>

      1.    In 2015, SS&C entered a Hosted Reseller Agreement (the "HRA") with Arcesium pursuant to which Arcesium was supposed to market, promote, and sell SS&C's portfolio accounting software, Geneva, for the benefit of both parties. Instead, Arcesium stole SS&C's intellectual property in order to create its own competing product. Adding insult to injury, Arcesium concocted a scheme to exploit its status as an authorized Geneva reseller and service provider to switch SS&C's current and prospective customers from Geneva to the product that Arcesium built with trade secrets stolen from SS&C. SS&C brings this action to redress Arcesium's theft, deception, and betrayal.

      2.    SS&C and Arcesium compete with each other in the financial technology industry. SS&C sells software, services, and solutions to a wide variety of financial firms.

Arcesium is a smaller, more recent, market entrant that specializes in services and solutions for hedge funds and fund administrators. In 2015, SS&C and Arcesium entered into the HRA, which allowed Arcesium to resell licenses for SS&C's portfolio accounting software, Geneva, and to use Geneva to provide Arcesium's own integrated solutions and services to customers. Arcesium lacked its own portfolio accounting solution—which enables asset management clients to maintain accurate books and records and to monitor their investments—so Arcesium relied on SS&C for this aspect of its product offering.

3.     Arcesium's access to Geneva under the HRA allowed it to avoid developing its own portfolio accounting solution, instead leveraging Geneva's popularity in the marketplace to sell its platform of solutions without making the investment required to develop its own technology. But the HRA had a five-year term after which either party could choose not to renew the agreement. Accordingly, Arcesium's access to and reliance on Geneva was precarious in that Arcesium risked losing the core portfolio accounting functionality that it required, just as it was trying to gain traction in the marketplace. Arcesium's concerns in this regard were well-founded as SS&C elected in late 2019 not to renew the HRA when the term ended in January 2020.

4.     Rather than addressing the risk of losing its access to Geneva lawfully by developing a portfolio accounting software solution on its own, Arcesium took an illegal shortcut and stole SS&C's confidential trade secrets, which Arcesium had access to as an authorized Geneva reseller and service provider. In particular, Arcesium used its access to Geneva trade secret information (i) to create its own competing portfolio accounting software that provides features and functionality in the same manner as Geneva, (ii) to develop interfaces between Arcesium's platform and Geneva (for use with customers who continued to use Geneva), and

(iii) to poach current and prospective Geneva customers using information learned as a Geneva service provider and reseller under the HRA.

5.     Arcesium doubled down on its theft by exploiting its status as an authorized Geneva reseller and service provider to unlawfully displace SS&C in the marketplace. Rather than work with SS&C to resell Geneva to customers in an arrangement that would benefit both parties (as required by the HRA), Arcesium used its reseller status to convert SS&C's current and prospective customers from Geneva to Arcesium's competing software built on trade secret information stolen from SS&C. Of course, Arcesium hid its use of SS&C's proprietary technology to develop its own competing product and its strategy to induce SS&C customers to transition onto this tainted product.

6.     SS&C brings this lawsuit to redress Arcesium's misappropriation of SS&C's trade secrets, unfair competition, and breaches of the express and implied terms of its reseller agreement with SS&C. SS&C seeks monetary damages, including punitive damages, and an injunction prohibiting Arcesium from continued trade secret misappropriation and continued violations of the post-termination provisions of the reseller agreement.

## PARTIES, JURISDICTION, AND VENUE

7.     Plaintiff SS&C Technologies is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 80 Lamberton Road, Windsor, Connecticut. SS&C Technologies is a global business with offices around the world, including an office in New York, New York. SS&C Technologies provides specialized software for the financial services industry.

8.     SS&C Technologies has several subsidiaries and affiliates, including Plaintiff Advent Software, Inc., which SS&C acquired on July 8, 2015. Advent is a corporation

organized and existing under the laws of the State of Delaware with its principal place of business in San Francisco, California.

9.     Defendant Arcesium is a limited liability company incorporated in the state of Delaware, with its principal place of business at 1166 Avenue of the Americas, Fourth Floor, New York, New York.

10.     This Court has subject matter jurisdiction under 18 U.S.C. § 1836(c), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendant Arcesium because Arcesium has its principal place of business in New York, through which it has a systemic and continuous course of doing business in New York, such that Arcesium is subject to general jurisdiction in New York. In addition, critical aspects of this case—including Arcesium's theft and use of SS&C's trade secrets—took place in this District.

## FACTS

## I.     Background Of SS&C, Arcesium, And The Hosted Reseller Agreement

### A.     SS&C

12.     SS&C is a pioneer in delivering software and software-enabled services to financial institutions to automate their complex business processes. Founded in 1986, SS&C has thousands of customers including banks and commercial lenders, mutual funds, hedge funds, private equity firms, real estate investment trusts, corporate treasury groups, insurance companies, pension funds, municipal finance groups, and real estate property managers. SS&C built its business through decades of hard work, ingenuity, technological innovation, and

investments of hundreds of millions of dollars to develop its valuable trade secrets and know-how.

13.     One of SS&C's offerings is its portfolio accounting software product, Geneva. First released in 1995, Geneva is designed to meet the real-time needs of asset managers, hedge funds, prime brokers, fund administrators, private equity firms, and family offices. SS&C licenses Geneva to customers throughout the United States and around the world. Geneva integrates the investment management process, portfolio management, and related functions. Among its features, Geneva serves as a single source of consolidated data that provides a comprehensive, accurate, and timely view of portfolio data across an entire firm. Geneva provides real time, granular data; eliminates manual data flow; provides a full audit trail; provides consistent, real-time position views; enables daily net asset value calculations; and delivers timely and accurate reporting.

14.     SS&C distributes Geneva in several ways. Principally, SS&C licenses Geneva directly to customers. Each direct customer has an individual license agreement with SS&C setting forth the terms of the license, which include the scope of permissible use, the duration of the license (including when it expires and may be renewed), and authorized users of the license. Some direct customers also obtain related services—such as hosting and integration with the customer's other technology systems—from SS&C, while other direct customers obtain such services from third parties, including Arcesium. If an SS&C customer wants to allow a third party to integrate its technology or services with Geneva, the customer must negotiate with SS&C for such third-party access as part of its Geneva license. Only authorized parties may access and use Geneva, which is the confidential intellectual property of SS&C.

15.     SS&C has also entered into a limited number of reseller agreements under which it designates certain third parties as authorized Geneva resellers and service providers. Arcesium was a licensed Geneva reseller and service provider until SS&C terminated the parties' HRA as of January 10, 2020.

**B.     The Geneva Trade Secret Information**

16.     Over several decades, and with the investment of significant time and money, SS&C developed Geneva to be a highly competitive portfolio accounting product. SS&C continues to invest millions of dollars in Geneva's development. SS&C has regularly maintained and updated Geneva to account for technological advances, new or revised accounting standards, and to provide new features and functionality.

17.     All portfolio accounting customers require fundamental accounting functionality, regardless of the asset classes in a customer's portfolio. Over time, SS&C has developed an array of proprietary methodologies to deliver this fundamental accounting functionality, as well as accounting functionality for sophisticated and complex asset classes, including complex accounting calculations, reporting, and portfolio management functions that are part of Geneva. Geneva's unique data and processing model, combined with its powerful standard and custom reporting capabilities, gives SS&C's customers the ability to analyze and view data in a variety of useful ways. Because of the great value customers place on this functionality, Geneva provides SS&C with significant economic value. The methodologies, models, and processes that power Geneva's functionality are highly confidential.

18.     The Geneva product consists of SS&C's proprietary and non-public intellectual property, including, but not limited to: the executable version of the Geneva software; Geneva's integration layer, which includes application programming interfaces ("APIs"), Geneva's Report Specification Language ("RSL"), and Geneva Loader; Geneva's

database schema; Geneva's data model; sample RSL files; Geneva's Browse utility (which provides a visual representation of the database schema and the associated relationships); Geneva's Data Browser tool (which provides a graphic user interface for running queries, and a visual representation of the database schema corresponding to such queries); and documentation related to each item previously listed. In addition, Geneva customer pricing constitutes SS&C proprietary, confidential information (collectively with the Geneva intellectual property described above, the "Geneva Trade Secret Information"). As explained below, Arcesium had comprehensive access to the Geneva Trade Secret Information through its status as a Geneva service provider and reseller under the HRA.

19.    Geneva's executable software constitutes SS&C's confidential and proprietary trade secrets. The software is made up of object code, which, when executed, performs proprietary portfolio accounting functions. The software stores investment data, portfolio data, price data, transaction data, and other data in a proprietary object-oriented relational database and uses the stored data to derive accounting data. The software then presents that accounting data in the form of Geneva reports. The software includes both graphical user interfaces and command-line interfaces to receive user inputs and provide user outputs to enable user interaction with Geneva. The software also includes an integration layer to receive inputs and commands from, and to provide outputs to, machine-executable processes. SS&C provides access to the executable version of Geneva only to users who agree to abide by strict confidentiality terms.

20.    Geneva's integration layer constitutes SS&C's confidential and proprietary trade secrets. The APIs, which are part of Geneva's integration layer, include many functions that are structured, sequenced and organized in a proprietary manner so as to interface

with Geneva. Geneva's RSL database query language, which is also part of Geneva's integration layer, is a proprietary programming language unique to Geneva and can be used to extract data from its database. The Geneva Loader, which is also part of Geneva's integration layer, is a command line interface for loading, editing, and deleting records from the Geneva database. Developers may interact with Geneva's integration layer to run Geneva specific functions and queries, to extract data from specific data fields in the Geneva database, or to input data into specific data fields in the Geneva database, and thereby to develop interconnections with other systems.

21.     Provided with Geneva's integration layer are sample packages, sample decompiled source code, and documentation, which provide detailed instructions and examples on using Geneva's integration layer and which constitute SS&C's confidential and proprietary trade secrets. For example, Arcesium had access to over 200 RSL files provided to it by SS&C, which include uncompiled source code for querying and extracting data from Geneva and using that data to formulate reports. Such reports combine relevant data fields in a specific order, based on business logic that SS&C developed and fine-tuned over many years. Examples include reports covering transactions, positions and tax lots, exposures, profit and loss, and net asset value reporting.

22.     Geneva's database schema and data model constitute SS&C's confidential and proprietary trade secrets. The database schema and data model include thousands of data fields stored in the Geneva databases, and their structure, sequence, organization, and relationships. Geneva's Browse utility, which also incorporates SS&C's confidential and proprietary trade secrets, provides a graphical user interface that visually illustrates Geneva's database schema and data model and the relationships between the data fields. Geneva's Data

Browser tool, which also incorporates SS&C's confidential and proprietary trade secrets, provides a graphical user interface that allows Geneva users to visually create queries and reports, and provides corresponding source code that identifies the relevant data fields in Geneva's database schema and the associated relationships.

23.    SS&C closely guards information about the prices it charges to its Geneva customers. This customer information constitutes SS&C's confidential and proprietary trade secrets. With this information, a Geneva competitor would have a significant and unfair advantage in selling competing software and services to those customers, undermining SS&C's efforts to maintain and grow its business with these customers and undercutting or impacting SS&C's pricing for products and services.

24.    The Geneva Trade Secret Information is among the most highly confidential and sensitive trade secret information that SS&C owns. The Geneva Trade Secret Information can be accessed only by SS&C personnel and customers with valid licenses and is subject to agreements with those customers that contain strict non-disclosure and confidentiality provisions.

25.    SS&C employs various security procedures and practices to protect its trade secrets and other confidential information. First, SS&C employees are required to follow strict confidentiality with respect to the Geneva Trade Secret Information and other confidential information of the company, including through signing non-disclosure agreements, signing SS&C's Code of Conduct and Employee Handbook, agreeing to abide by SS&C's Information Security Acceptable Use Policy, and receiving training on SS&C's policies, all of which prohibit employees from disclosing SS&C's confidential and trade secret information including the Geneva Trade Secret Information.

9

26.     Second, SS&C has enacted security measures to protect SS&C information stored on the company's network, including, but not limited to: (1) controls designed to protect its network from unauthorized access and unauthorized software installation; (2) network segmentation and firewalls used to control access to confidential information; and (3) procedures that restrict employee access to network folders and data sources to those which are necessary to perform their job functions. Since at least 2013, SS&C's computers have been subject to technical controls that prevent users from transferring data onto storage devices, such as USBs. Also, since at least 2013, SS&C's computers have restricted access to certain websites, including cloud-based file sharing websites.

27.     Third, SS&C places extensive confidentiality designations on its proprietary documents. For example, documentation accompanying the Geneva Trade Secret Information typically states the following or includes similar indications of confidentiality: "The software described in this document is furnished under a license agreement with Advent and subject to third parties' license terms . . . . The software may be used or copied only in accordance with the terms of the agreement. No part of this document may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, for any purpose without the express written permission of Advent . . . . *This document, which is provided solely to Licensees of Advent Software, Inc., is confidential and proprietary*" (emphasis in original).

28.     Fourth, customers and prospects sign non-disclosure agreements before the Geneva Trade Secret Information is disclosed to them. In addition, the agreements entered into by customers who receive or have access to Geneva Trade Secret Information have provisions requiring that customers treat Geneva and the supporting documentation as

confidential and not use the information for any purpose outside the relevant agreement or disclose the information to third parties.

29. Fifth, access to Geneva is limited to authorized users who have a valid license key and log-in credentials.

30. As detailed below, Arcesium's HRA agreement with Advent acknowledged that Arcesium would "have access to [Advent's] Confidential Information" and, in Section 11.1, defined "Confidential Information" as "non-public information clearly identified as proprietary or confidential, information or data protected as confidential or trade secret at law, or which given its nature and the circumstances surrounding its disclosure should reasonably be construed to be confidential including, without limitation, [Geneva], the [Geneva] Documentation, [and] customer (including [resold] Customer and Prospective Customer) and vendor information[,] . . . . pricing terms, [and] code." Arcesium further agreed "not to use [Advent's] Confidential Information . . . for any purpose other than to perform its obligations or exercise its rights hereunder" and "not to disclose . . . [Advent's] Confidential Information, or otherwise make the . . . Confidential Information available in any form to any third party except as necessary to perform hereunder . . . ."

### C.    Arcesium And The Hosted Reseller Agreement With SS&C

31. Arcesium was founded in 2014 as a spin-off of an internal technology group at D. E. Shaw & Co. ("D. E. Shaw"). Arcesium's business plan was to provide asset managers with technological solutions and support services for their back and middle office functions. D. E. Shaw was an authorized licensee of Geneva at the time, which meant that the group that spun off from D. E. Shaw had extensive experience and familiarity with Geneva.

32. Arcesium's technology is designed to allow customers to perform certain post-trade tasks, including cash management, collateral management, data management,

corporate action processing, and reconciliation. Arcesium refers to its suite of post-trade solutions as its "platform." The Arcesium platform was not originally designed to handle portfolio accounting functions for customers.

33.   In 2015, Arcesium and SS&C entered the HRA by which Arcesium became a licensed reseller and service provider for Geneva. Arcesium sought to offer customers a single, integrated solution where Geneva portfolio accounting software was deployed alongside, and integrated with, the Arcesium platform to handle all aspects of the customer's post-trade tasks. The fundamental purpose of the HRA was for Arcesium to promote, market, and encourage customers to purchase Geneva for the benefit of both parties. Indeed, Arcesium has referred to the HRA as a "partnership."

**D.   Arcesium's Access To Geneva Trade Secret Information**

34.   Arcesium had extensive access to the Geneva Trade Secret Information—including the executable version of the software, the Geneva integration layer (including APIs), the RSL language and sample files and reports, the database schema, the data model, the Browse utility, the Data Browser, the associated documentation, and the confidential customer information—by virtue of the HRA with SS&C and Arcesium's role as service provider to other Geneva clients.

35.   Arcesium's access to Geneva Trade Secret Information was controlled and subject to strict conditions set forth in agreements that, among other things, limited Arcesium's access to Geneva for express purposes and outlined the highly confidential nature of the information and software to which it had access. Arcesium had access to Geneva Trade Secret Information in several ways.

36.   The HRA authorized Arcesium to offer customers a sublicense to Geneva and permitted Arcesium to provide certain Geneva-related services to those customers. The

initial term of the HRA was five years (ending on January 10, 2020), which could be renewed if both parties agreed. Section 3 of the HRA granted Arcesium a license "to load, install, access, execute, perform, display, view, store and otherwise use [Geneva], . . . on hardware and other equipment owned or contractually controlled by [Arcesium] . . . in production, test, development, staging, failover, disaster recovery and such other environments as are reasonably necessary to provide access to [Geneva] to Customers." Arcesium was permitted to use Geneva "***solely to perform for the benefit of Customers under the applicable Customer Agreement***" (emphasis added).

37.     The HRA expressly restricts Arcesium's use of Geneva in several critical ways. Among other things, Arcesium was not authorized to use Geneva to build its own competing products. For example, Section 5 of the HRA states in relevant part that Arcesium may not "decompile, disassemble, reverse engineer, or otherwise attempt to derive source code from [Geneva]"; "modify or create derivative works from [Geneva] or [Geneva] Documentation"; or "use [Geneva] for its own (e.g., not its Customers') internal data processing operations."

38.     Section 11.2 of the HRA is a broad confidentiality provision that states, among other things, that Arcesium agrees "not to use [SS&C's] Confidential Information . . . for any purpose other than to perform its obligations or exercise its rights hereunder" and "not to disclose . . . [SS&C's] Confidential Information, or otherwise make the . . . Confidential Information available in any form to any third party except as necessary to perform hereunder or under a Customer Agreement . . . provided that . . . such disclosure of Confidential Information to a third party is subject to obligations of confidentiality as restrictive as those set forth herein . . . ."

13

39.     Upon non-renewal or termination of the HRA, Section 10.8 provides that Arcesium will "cease all use of [Geneva], and return to Advent or destroy all copies of [Geneva] and provide Advent with written certification thereof." Section 10.4 of the HRA provides that if the agreement expires or is terminated (other than for Arcesium's breach), Arcesium is permitted certain run-off rights to continue providing Geneva to existing customers for a limited time period. Accordingly, Arcesium had access to Geneva even after expiration of the HRA, but only for a limited time period and only to service existing customers as of the time the HRA expired. Arcesium's run-off rights were conditioned on Arcesium abiding by the other terms of Section 10.4 which, as explained below, Arcesium failed to do.

40.     Arcesium also had contractual arrangements with several of SS&C's Geneva customers to provide services in connection with the customers' use of Geneva, including arrangements that are ongoing and continue to provide Arcesium access to Geneva. Each such Geneva customer already had an agreement with SS&C that required the customer (and any third-party service provider such as Arcesium) to treat all SS&C non-public information confidentially, including the Geneva Trade Secret Information. Further, SS&C's contracts with these customers provided that the customer (and any authorized third-party service provider) could only use the Geneva Trade Secret Information for the customer's benefit. None of these arrangements permitted Arcesium to use the Geneva Trade Secret information for its own business or to develop a competing product that it would use to compete against SS&C for other customers.

## II.    Arcesium's Theft And Use Of SS&C Trade Secrets At SS&C's Expense

### A.    Arcesium's Theft Of Geneva Trade Secrets

41.     Arcesium originally designed its technology platform of post-trade solutions to use Geneva as its portfolio accounting engine. Arcesium's access to Geneva under

the HRA allowed it to avoid the time and effort that developing its own alternative software would have entailed. Arcesium relied on Geneva for obvious reasons—Geneva was, and remains, a well-known and highly regarded portfolio accounting software product and customers would naturally be drawn to Arcesium's platform because of its ability to integrate with Geneva. Accordingly, Geneva became a critical aspect of Arcesium's platform offering to its clients.

42.    According to a declaration submitted by Arcesium's CEO, Gaurav Suri, in the matter *Arcesium LLC v. Advent Software, Inc. and SS&C Technologies Holdings, Inc.* Case No: 1:20-cv-04389 (MKV), as of June 18, 2020, Arcesium needed to "access, interface with and operate the Geneva software" in order to service nearly all of its customers. Suri further declared that, as of that date, "Arcesium, and these customers, depend on the integrated Arcesium-Geneva platform as the operational foundation of their day-to-day business."

43.    Given Arcesium's dependence on Geneva and the limited five-year term of the HRA, it was imperative for Arcesium to find a substitute for Geneva in case the HRA was terminated, which SS&C had the contractual right to do unilaterally. Given that it had developed its platform to integrate specifically with Geneva and that it had access to the Geneva Trade Secret Information both before and after the HRA's termination, Arcesium decided that misappropriating the Geneva Trade Secret Information was the most efficient and effective means of developing portfolio accounting software capable of competing in the marketplace, and with SS&C in particular.

44.    Accordingly, Arcesium used the Geneva Trade Secret Information (i) to create its own competing portfolio accounting software that provides features and functionality in the same manner as Geneva, (ii) to develop interfaces between Arcesium's platform and Geneva (for use with customers who continued to use Geneva), and (iii) to poach current and

prospective Geneva customers using information learned as a Geneva service provider and

reseller under the HRA. In particular, to develop and commercialize its own portfolio accounting

software, Arcesium misappropriated Geneva Trade Secret Information including with respect to

the Geneva integration layer (APIs, RSL files, and the Geneva Loader), and the Geneva database

schema, data model, associated documentation, and confidential customer pricing information.

> **B.    Arcesium's Betrayal Of Its Obligation Under The HRA To Sell Geneva For The Parties' Mutual Benefit**

45.    In tandem with its strategy of stealing Geneva trade secrets to develop its

own competing portfolio accounting software, Arcesium devised a plan to steal Geneva

customers using confidential customer pricing information Arcesium had obtained solely

because of its relationship with SS&C under the HRA or because of its contractual relationships

with certain of SS&C's Geneva customers.

46.    Arcesium decided to use the HRA and its relationships with certain of

SS&C's Geneva customers improperly to gain access to prospective and existing Geneva

customers and then to convert them to Arcesium's own portfolio accounting software once it was

developed. Of course, Arcesium hid this scheme from SS&C.

47.    Rather than work in partnership with SS&C as contemplated by the HRA,

Arcesium was looking out only for itself; Arcesium used its access to customers through the

HRA and to certain of SS&C's Geneva customers to switch or attempt to switch them to its own

portfolio accounting software.

> **C.    Arcesium's Breach Of Its Post-Termination Obligations Under The HRA**

48.    On October 1, 2019, SS&C notified Arcesium that it would not renew the

HRA, and the Agreement terminated by its terms on January 10, 2020. Thereafter, Arcesium no

longer had a license or right to use, access, promote, or market Geneva and related software

other than limited run-off rights with certain existing customers. Under Arcesium's limited run-off rights, Arcesium continues to service one such customer and thus has ongoing access to Geneva Trade Secret Information (Arcesium also continues to have access to Geneva through another customer who has a Geneva contract directly with SS&C and to whom Arcesium provides related services).

49.    One of the provisions of the HRA to survive termination is Section 10.4. Under Section 10.4, Arcesium undertook, upon termination of the Agreement, to "immediately cease promoting, marketing and offering to sell [Geneva] to prospective Customers." Arcesium also promised not to "service any party with [Geneva], or offer or provide access to [Geneva] to any party," except with respect to Arcesium's run-off rights as to certain existing customers.

50.    SS&C included these prohibitions in the HRA because it did not want Arcesium to promote Geneva in any way after the expiration of the HRA. SS&C carefully monitors and controls the marketing of Geneva to ensure that information disseminated to the market is accurate, complete, and consistent with SS&C's marketing strategies, and so that prospective clients' expectations are appropriately set. These efforts are undermined if unauthorized parties market Geneva on their own.

51.    Arcesium violated its post-expiration obligations by repeatedly marketing, promoting, and offering Geneva-related services to prospective customers after January 10, 2020, including, but not limited to, a hedge fund customer ("Customer A"). As a result of Arcesium improperly marketing Geneva, Customer A became frustrated with the dispute between SS&C and Arcesium, and SS&C ultimately lost the business.

52.    Further confirming that Arcesium intended to continue marketing, promoting, and offering Geneva and related services, Arcesium improperly solicited one of

SS&C's key Geneva subject matter experts *after* SS&C had given notice of non-renewal of the HRA and Arcesium understood that its license would terminate in a manner of weeks. In December 2019, Arcesium interviewed the SS&C executive about his Geneva work, making clear that Arcesium wished to draw on that expertise if he were hired. In particular, Arcesium indicated to the SS&C executive that Arcesium wanted to hire him to help Arcesium sell Geneva and Geneva-related services. Arcesium made this offer to gain access to additional Geneva Trade Secret Information, including "know-how" related to Geneva and its users' expectations; this would allow Arcesium to continue to improperly sell Geneva, despite the imminent termination of the HRA, and at the same time help Arcesium design, develop, and market a competing product more quickly using Geneva Trade Secret Information. The employee declined the offer.

53.    Arcesium's effort to poach SS&C's key Geneva employee was a violation of Section 17.9 of the HRA, which prohibits Arcesium from soliciting SS&C employees during the term of the HRA and for one year thereafter. This solicitation shows that Arcesium's decision to continue marketing Geneva following expiration of the HRA was deliberate and premeditated.

54.    By letter dated April 13, 2020, SS&C notified Arcesium of its breaches of Section 10.4. Based on those breaches, SS&C terminated all of Arcesium's surviving rights under the HRA. Arcesium was concerned enough about its own wrongful conduct that it sent purported "cure" notices to prospective customers to correct the misimpression that Arcesium could still sell and service Geneva. The so-called cure notices were ineffective because they put SS&C in the difficult position of having to explain to customers why Arcesium's representations about its Geneva access and capabilities were incorrect.

D.    **Arcesium Has Successfully Transitioned SS&C's Clients Away From Geneva And Competed Against SS&C Using Misappropriated Trade Secrets**

55.    Arcesium's theft of SS&C's trade secrets and its breaches of the HRA have been successful for Arcesium and harmful to SS&C. Arcesium has sold and is selling its solutions, developed using misappropriated Geneva Trade Secret Information, to customers, including ones that previously used or were considering using Geneva. This has resulted in a "double whammy" to SS&C: Not only has Arcesium profited from the sale of solutions based on SS&C's proprietary technology, but Arcesium has used that advantage to displace Geneva from SS&C's existing customers in the market and to compete directly against SS&C.

56.    As noted, after the HRA terminated on January 10, 2020, Arcesium continued to service certain existing resold customers whose individual agreements had not yet expired. One such resold customer ("Customer B") was a hedge fund serviced by Arcesium that used Geneva to perform the hedge fund's portfolio accounting. In addition to its fundamental accounting functionality, Customer B required support from some of Geneva's most sophisticated features, including accounting support for bank loans. Customer B's Geneva license expired on February 10, 2021, after which neither Customer B nor Arcesium had a right to access Geneva. A transition from Geneva to another portfolio accounting solution is typically a complex and time-consuming process for which customers need assistance from SS&C. Yet SS&C received no such request with respect to Customer B's transition from Geneva to another portfolio accounting solution. Customer B switched from Geneva to Arcesium's portfolio accounting solution, which was developed to mimic Geneva's functionality.

57.    Another such resold customer ("Customer C") was a fund of funds serviced by Arcesium that used Geneva to perform the fund of fund's portfolio accounting. Customer C's Geneva license expired on September 10, 2021, after which neither Customer C

nor Arcesium had a right to access Geneva. A transition from Geneva to another portfolio accounting solution is typically a complex and time-consuming process for which customers need assistance from SS&C. Yet SS&C received no such request with respect to Customer C's transition from Geneva to another portfolio accounting solution. Customer C switched from Geneva to Arcesium's portfolio accounting solution, which was developed to mimic Geneva's functionality.

58.     Arcesium has also competed against SS&C for new business that required Arcesium to have a portfolio accounting solution with features and functionality similar to Geneva. For example, in or around November 2020, Arcesium competed with SS&C to provide a portfolio accounting solution to a financial institution ("Customer D") that, in addition to fundamental accounting functionality, could handle swaps (a form of financial derivatives). SS&C did not win that business and does not know if Customer D signed an agreement with another provider. In or around October 2021, Arcesium competed with SS&C to provide a portfolio accounting solution that could handle equity securities and derivatives to a hedge fund ("Customer E"); Arcesium won that business. In or around the first quarter of 2022, Arcesium competed with SS&C to provide a portfolio account solution that could handle equity securities and derivatives to another hedge fund ("Customer F"). The fact that Arcesium is even competing in these situations establishes that Arcesium has a portfolio accounting solution capable of performing functions similar to Geneva.

59.     In addition, Arcesium created a tool that Arcesium claimed could serve as a means of connecting Geneva with Arcesium's platform in instances in which Arcesium was not authorized to directly connect with Geneva but the customer wished to use or continue using Geneva. In particular, Arcesium approached a hedge fund ("Customer G") who had a direct

contractual relationship with SS&C to use Geneva, and to whom Arcesium provided services integrated with Geneva; until July 10, 2020 (later extended to March 10, 2021), Customer G's contract with Geneva permitted Arcesium to directly connect its platform with Geneva. Understanding that it would no longer be permitted to directly connect with Geneva, in June 2020 Arcesium informed Customer G that it had a tool that would enable Arcesium to connect with Geneva indirectly and Customer G relayed Arcesium's proposal to SS&C. Customer G declined that arrangement. This kind of tool requires intimate knowledge of Geneva's integration layer, database schema, and data model. On information and belief, Arcesium created this tool by misappropriating Geneva Trade Secret Information.

60.    Arcesium has also publicly touted functionality based on misappropriated Geneva Trade Secret Information. According to an Arcesium whitepaper published in July 2021, Arcesium now "generat[es] profit and loss information for hundreds of thousands of holdings."[1] Before the misappropriation, Arcesium did not have the capability to generate profit and loss information, and instead relied on Geneva, as the portfolio accounting engine of the Arcesium platform, to do so.

**E.    Arcesium Would Not Have Been Able To Develop Competing Software In the Timeframe At Issue Absent Use of the Geneva Trade Secret Information**

61.    The speed with which Arcesium was able to replace its reliance on Geneva with its own portfolio accounting software further demonstrates that Arcesium misappropriated Geneva Trade Secret information rather than developing a replacement on its own.

---

[1] *See*: https://www.arcesium.com/assets/pdf/Arcesium%20-%20Accessing%20Millions%20of%20Financial%20Data%20Points%20Using%20Snowflake%20Secure%20Data%20Sharing.pdf

62.    According to the declaration of Arcesium's CEO, he was "not concerned" as of October 2019 about the imminent expiration of the HRA as he presumed it would be renewed and Arcesium would continue to have access to, and be able to rely on, Geneva. As of December 2019, Arcesium impermissibly attempted to solicit an SS&C executive in order, among other things, to assist Arcesium to sell Geneva and Geneva-related services. And, on June 18, 2020, Arcesium's CEO declared that Arcesium and its customers were wholly reliant on Geneva.

63.    Both Arcesium's CEO and its Director and Head of Technology, Bryan Dougherty, declared that it would take considerable time (Arcesium's CEO stated, "12 months, at a minimum") simply to transition away from Geneva to another provider's portfolio accounting software—a period which does not contemplate Arcesium's internal development of its own complex and sophisticated competing software, which would take even longer. In other words, Arcesium's most senior executives have stated in sworn declarations that, at least through June 2020, Arcesium did not have its own portfolio accounting software and was not close to developing and deploying such software. The executives have further declared that it would take at least a year to transition Arcesium's then existing clients to another provider's software. For Arcesium to develop its own solution in-house, and transition its own clients to that software, would take far longer.

64.    Yet, by February 2021, Arcesium appears to have developed its own portfolio accounting software and transitioned Customer B from Geneva to Arcesium's own software. By July 2021, Arcesium was publicly advertising its ability to perform functions for which it had previously relied on Geneva. By September 2021, Arcesium appears to have transitioned Customer C to its own portfolio accounting software. And, starting in late 2020,

Arcesium competed with SS&C for Customers D, E, and F, which required that Arcesium have a portfolio accounting solution that had the same functionality as Geneva. All of these customers required the fundamental accounting functionality developed on a confidential and proprietary basis by SS&C over many years and delivered through its Geneva software. In addition, in mid-2020, Arcesium was offering Customer G a means of indirectly connecting Geneva with Arcesium's platform. Arcesium would not have been able to plan, design, develop, and market a competing portfolio accounting solution and offer a seamless transition from Geneva—nor would it have been able to offer a tool to indirectly connect its platform with Geneva—during the time period in question had it not had access to, and misappropriated, Geneva Trade Secret Information.

## FIRST CLAIM FOR RELIEF

(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

65.     SS&C repeats and realleges each allegation set forth above as if fully set forth herein.

66.     SS&C is the rightful legal owner of the Geneva Trade Secret Information, which constitutes protectable trade secrets, including under 18 U.S.C. § 1836.

67.     Arcesium misappropriated the Geneva Trade Secret Information, which relates to products used in, and intended for use in, interstate and foreign commerce. Arcesium acquired the Geneva Trade Secret Information through improper means, including through theft and in breach of Arcesium's duty to maintain the secrecy of SS&C's trade secrets. Arcesium also used the Geneva Trade Secret Information, without SS&C's consent, while under a duty to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

68.     The Geneva Trade Secret Information contains, without limitation, SS&C's financial, business, scientific, technical, economic, or engineering information,

including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and codes.

69.     SS&C took reasonable measures to keep the Geneva Trade Secret Information secret and confidential, including by instituting applicable information security policies and trainings, causing employees and Geneva licensees to sign non-disclosure and confidentiality agreements, designating documents "Confidential," and instructing third-party licensees and customers with access to Geneva that SS&C's intellectual property belonged to SS&C and could not be used for purposes other than those specifically set forth in the parties' relevant agreements.

70.     The Geneva Trade Secret Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information.

71.     Arcesium derived substantial value from the information contained in the Geneva Trade Secret Information. Among other things, Arcesium used the Geneva Trade Secret Information to develop its own competing product and to convert certain of SS&C's Geneva customers to Arcesium's tainted product.

72.     As a direct and proximate cause of Arcesium's trade secret misappropriation, SS&C has suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

(Common Law Misappropriation of Trade Secrets)

73.     SS&C repeats and realleges each allegation set forth above as if fully set forth herein.

74.     The Geneva Trade Secret Information consists of confidential, proprietary, and trade secret information that is not public, not readily created or discoverable by others, and which is the product of extensive investment by SS&C, both in terms of time and money. SS&C has undertaken extensive efforts to maintain the confidentiality of its trade secret intellectual property (including the Geneva Trade Secret Information), none of which is in the public domain. If made available to others, the Geneva Trade Secret Information would enable them to compete with SS&C to SS&C's detriment.

75.     Arcesium acquired the Geneva Trade Secret Information through improper means, including through theft and in breach of Arcesium's duty to maintain the secrecy of SS&C's trade secrets. Arcesium also used the Geneva Trade Secret Information, without SS&C's consent, while under a duty to maintain the secrecy of the trade secrets and limit the use of the trade secrets.

76.     Arcesium derived substantial value from the information contained in the Geneva Trade Secret Information. Among other things, Arcesium used the Geneva Trade Secret Information to develop its own competing product and to convert certain of SS&C's Geneva customers to Arcesium's tainted product.

77.     The means used by Arcesium in effectuating this misappropriation were intentional, willful, malicious, unlawful, unfair, and otherwise improper.

78.     As a direct and proximate cause of Arcesium's trade secret misappropriation, SS&C has suffered damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

(Unfair Competition)

79.     SS&C repeats and realleges each allegation set forth above as if fully set forth herein.

80.    At all relevant times, SS&C has maintained a property right in its labor, skill, expenditure, name, and reputation in connection with the Geneva Trade Secret Information.

81.    The Geneva Trade Secret Information includes a vast amount intellectual property and proprietary information, in various forms, that Arcesium was permitted by the HRA and other customer license agreements to access only for the limited purposes prescribed therein.

82.    To secure an unfair competitive advantage against SS&C, Arcesium misappropriated SS&C's proprietary information and trade secrets by obtaining access to the Geneva Trade Secret Information through deception and/or the abuse of its confidential relationship.

83.    Arcesium acted in bad faith when it used access to the Geneva Trade Secret Information, not for the limited purposes permitted under the HRA or customer license agreements, but instead to develop, enhance, market, and sell its own product to compete against SS&C unfairly and to solicit SS&C's actual and prospective customers.

84.    As a direct and proximate cause of Arcesium's unfair competition, SS&C has suffered damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

(Breach of Contract)

85.    SS&C repeats and realleges each allegation set forth above as if fully set forth herein.

86.    The HRA is a legal, valid, and enforceable contract with clear and definite terms. The HRA is supported by consideration and SS&C has performed its obligations under the HRA.

87.    Arcesium has materially breached the HRA by violating Section 3 of the HRA, which grants Arcesium a license "to load, install, access, execute, perform, display, view,

26

store and otherwise use [Geneva], . . . solely to perform for the benefit of Customers under the applicable Customer Agreement."

88.     Arcesium has materially breached the HRA by violating Section 5 of the HRA, which requires Arcesium not to "decompile, disassemble, reverse engineer, or otherwise attempt to derive source code from [Geneva]"; "modify or create derivative works from the [Geneva] or [Geneva] Documentation" or "use [Geneva] for its own (e.g., not its Customers') internal data processing operations."

89.     Arcesium has materially breached the HRA by violating Section 10.4, which requires Arcesium, following termination of the HRA on January 10, 2020 to "immediately cease promoting, marketing and offering to sell [Geneva] to prospective Customers" and not to "service any party with [Geneva], or offer or provide access to [Geneva] to any party," except with respect to certain existing customers.

90.     Arcesium has materially breached the HRA by violating Section 10.8 of the HRA that requires Arcesium, upon termination, to "cease all use of [Geneva], and return to Advent or destroy all copies of [Geneva] and provide Advent with written certification thereof."

91.     Arcesium has materially breached the HRA by violating Section 11.2, which requires Arcesium "not to use [SS&C's] Confidential Information . . . for any purpose other than to perform its obligations or exercise its rights hereunder."

92.     As a direct and proximate result of Arcesium's breach of the HRA, SS&C has suffered damages in an amount to be determined at trial.

## **FIFTH CLAIM FOR RELIEF**

(Breach of Covenant of Good Faith and Fair Dealing)

93.      SS&C repeats and realleges each allegation set forth above as if fully set forth herein.

27

94.     The HRA is a written contract that, pursuant to Section 17.4, is "governed by and construed in accordance with the laws of the State of New York."

95.     The HRA contains an implied covenant of good faith and fair dealing. This covenant requires that neither party do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

96.     Under the HRA, Arcesium was obligated to use its access to Geneva to promote, market, and offer Geneva to customers for the mutual benefit of both parties and to do so in good faith. Arcesium has referred to the HRA as a "partnership" between the parties.

97.     Rather than resell Geneva in good faith, Arcesium acted in bad faith when it engaged in a concerted effort to encourage SS&C's customers to transition away from the Geneva product, poach a key SS&C employee, and misappropriate SS&C's intellectual property, which was a means of stealing SS&C's prospective and existing customers.

98.     As a direct and proximate result of Arcesium's breaches of the implied covenant of good faith and fair dealing, SS&C has suffered damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

99.     Under Federal Rule of Civil Procedure 38, SS&C respectfully requests a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, SS&C respectfully prays for a judgment against Arcesium on all claims, and requests a judgment providing the following relief:

(a)     General and compensatory damages in an amount to be determined at trial;

(b)  Actual damages, damages for unjust enrichment, and damages measured as a reasonable royalty, as authorized by 18 U.S.C. § 1836(b)(3)(B) and New York law;

(c)  Exemplary damages for Arcesium's willful and malicious misappropriation of SS&C's trade secrets, as authorized by 18 U.S.C. § 1836(b)(3)(C);

(d)  Punitive damages against Arcesium under each of the asserted causes of action for their intentional bad acts;

(e)  Necessary and appropriate equitable and injunctive relief, including an order, as authorized by 18 U.S.C. § 1836(3)(A), permanently enjoining and restraining Arcesium, and all those acting in concert with Arcesium, from misappropriating, converting, possessing, accessing, sharing, using or in any way disseminating SS&C's confidential information, including any work product or computer code copied, derived or recreated from SS&C's confidential information;

(a)  SS&C's costs and disbursements in this action, including reasonable attorneys' fees (*see* 18 U.S.C. § 1836(b)(3)(D));

(b)  Pre-judgment and post-judgment interest; and

(c)  Such other and further relief as this Court deems just and proper.

Dated: New York, New York
     March 10, 2022

                              SHEARMAN & STERLING LLP

                              By: */s/   Stephen R. Fishbein*
                              Stephen R. Fishbein
                              John A. Nathanson
                              Christopher L. LaVigne
                              Michael W. Holt
                              SHEARMAN & STERLING LLP
                              599 Lexington Avenue
                              New York, New York 10022
                              Telephone: (212) 848-4000
                              Facsimile: (212) 848-7179
                              Email: stephen.fishbein@shearman.com
                                      john.nathanson@shearman.com
                                      christopher.lavigne@shearman.com
                                      michael.holt@shearman.com

                              *Attorneys for SS&C Technologies Holdings,*
                              *Inc. and Advent Software, Inc.*