UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SS&C TECHNOLOGIES HOLDINGS, INC. and ADVENT SOFTWARE, INC., | |
| Plaintiffs, | |
| -against- | |
| ARCESIUM LLC, | |
| Defendant. | 22-CV-02009 (TMR-OTW) |
| ARCESIUM LLC, | **OPINION & ORDER** |
| Counterclaim-Plaintiff, | |
| -against- | |
| SS&C TECHNOLOGIES HOLDINGS, INC. and ADVENT SOFTWARE, INC., | |
| Counterclaim-Defendants. | |

Dated: December 20, 2024

Stephen R. Fishbein, John A. Nathanson, Christopher L. LaVigne, Eric S. Lucas, Benjamin Klebanoff, Sheyla D. Soriano, Allen Overy Shearman Sterling US LLP, of New York, N.Y., for plaintiffs and counterclaim defendants SS&C Technologies Holdings, Inc., and Advent Software, Inc.

James J. Pastore, Jr., Megan K. Bannigan, Wendy B. Reilly, Brandon Fetzer, Mark P. Goodman, Debevoise & Plimpton LLP, of New York, N.Y., for defendant and counterclaim plaintiff Arcesium LLC.  Of counsel was Richard L. Green, Gordon Rees Scully Mansukhani LLP, of Glastonbury, C.T.

<u>TIMOTHY M. REIF</u>, Judge, United States Court of International Trade, Sitting by Designation:

Plaintiffs and counterclaim defendants SS&C Technologies Holdings, Inc. and Advent Software Inc. (collectively, "SS&C" or "plaintiff") commenced this action, alleging that defendant and counterclaim plaintiff Arcesium LLC ("Arcesium" or "defendant") violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, by misappropriating SS&C's trade secrets associated with SS&C's portfolio accounting software, Geneva, and using such secrets to develop a competing product. Additionally, plaintiff alleges common law misappropriation of trade secrets and breaches of the contract governing parties' licensing of the subject software. Am. Compl. ¶¶ 91-123, ECF No. 36. On June 11, 2022, Arcesium filed counterclaims, alleging breaches of contract, tortious interference with a contract, common law unfair competition and tortious interference with prospective economic advantage. Def.'s Countercl. ¶¶ 88-145 ("Countercl."), ECF No. 47.

Before the court are defendant's motion to dismiss plaintiff's amended complaint and plaintiff's motion to dismiss defendant's counterclaims. For the reasons discussed below, the court dismisses with prejudice plaintiff's DTSA and common law trade secret misappropriation claims and declines to exercise supplemental jurisdiction over plaintiff's remaining state-law claims and defendant's state-law counterclaims, which are dismissed without prejudice.

# BACKGROUND

## I.  Procedural history

On March 10, 2022, plaintiff filed its complaint in the instant action against defendant.  Compl., ECF No. 1.  On May 20, 2022, plaintiff filed an amended complaint.  Am. Compl.  The amended complaint alleges that defendant stole plaintiff's trade secrets to develop portfolio accounting software that competes with plaintiff's software, Geneva.  *Id.* ¶¶ 48-69.  Plaintiff brings claims of trade secret misappropriation under the DTSA and New York common law, as well as claims of unfair competition and breach of contract.  *Id.* ¶¶ 91-123.

On June 10, 2022, defendant moved to dismiss plaintiff's amended complaint.  Def. Mot. to Dismiss First Am. Compl., ECF No. 40; Def. Mem. Supp. Mot. to Dismiss ("Def. Br."), ECF No. 43.  Defendant argues that plaintiff failed to allege the existence of any trade secrets with sufficient specificity.  Def. Br. at 8-14.  Defendant argues further that plaintiff failed to show misappropriation through the facts pleaded in the complaint.  *Id.* at 17-24.

On July 1, 2022, plaintiff opposed defendant's motion, arguing that the amended complaint met the requirements to survive dismissal under Fed. R. Civ. P. 12(b)(6).  Pl. Mem. Opp. Mot. to Dismiss ("Pl. Opp. Br."), ECF No. 59.  On July 15, 2022, defendant replied, reiterating its argument that plaintiff failed to allege the existence of any trade secrets and misappropriation.  Def. Reply Mem. Supp. Mot. to Dismiss ("Def. Reply Br."), ECF No. 70.

On June 11, 2022, defendant filed counterclaims under New York state law
for breach of contract, tortious interference and unfair competition. Countercl. ¶¶
88-145. Defendant alleges that plaintiff has been intentionally stifling defendant's
legitimate competition, including by terminating defendant's contractual rights and
using plaintiff's market position to steal business and by "us[ing] Geneva's position
as the market leading portfolio accounting software to force Arcesium to accept
unfair terms for certain Geneva licenses." *Id.* ¶¶ 11-13.

On July 8, 2022, plaintiff moved to dismiss defendant's counterclaims. Pl.
Mot. to Dismiss Counterclaims, ECF No. 62; Pl. Mem. Supp. Mot. to Dismiss
Counterclaims ("Pl. Countercl. Br."), ECF No. 64. Plaintiff argues that the court
lacks subject matter jurisdiction over defendant's state law counterclaims because
there is no diversity between parties, no federal cause of action and no common
nucleus of fact with plaintiff's federal DTSA claim. Pl. Countercl. Br. at 7. Plaintiff
argues further that, regardless, the allegations fail to state claims upon which relief
can be granted. *Id.* at 2. Defendant opposes plaintiff's motion, arguing that the
court has subject matter jurisdiction because defendant brought compulsory
counterclaims related to the same contract that SS&C alleges Arcesium breached.
Def. Mem. Opp. Mot. to Dismiss Counterclaims ("Def. Countercl. Opp. Br."), ECF
No. 81. Plaintiff replied, arguing that, even if the counterclaims are compulsory as
to plaintiff's state law claims, the counterclaims do not share a common nucleus of
operative fact with plaintiff's federal DTSA claim. Pl. Reply Mem. Supp. Mot. to
Dismiss Counterclaims ("Pl. Reply Br."), ECF No. 84.

## II.    Factual background

Plaintiff SS&C and defendant Arcesium compete in the financial technology industry.  Am. Compl. ¶ 2.  Plaintiff's product, Geneva, is a "portfolio accounting software product . . . designed to meet the real-time needs of asset managers, hedge funds, prime brokers, fund administrators, private equity firms and family offices." *Id.* ¶ 15 ("Geneva serves as a single source of consolidated data that provides a comprehensive, accurate and timely view of portfolio data across an entire firm."). Plaintiff licenses Geneva directly to customers, as well as through a limited number of reseller agreements.  *Id.* ¶¶ 16-17.

In 2015, SS&C and Arcesium entered into a Hosted Reseller Agreement ("HRA") for an initial five-year term, ending in January 2020.  *Id.* ¶¶ 35, 38.  Under the HRA, Arcesium was authorized to "offer customers a sublicense to Geneva . . . and provide certain Geneva-related services to those customers."  *Id.*  Arcesium was not permitted to "use Geneva to build its own competing products for use after the HRA expired," "disclose . . . [SS&C's] Confidential Information" or use Geneva upon non-renewal or termination of the HRA, with the exception of certain run-off rights. *Id.* ¶¶ 39-41.

In 2018, prior to the HRA's expiration, Arcesium began to develop its own portfolio accounting platform, Trinity, which it launched in 2021.  *Id.* ¶ 3; Def. Br. at 4.  Additionally, Arcesium developed an interface software, Nautilus, which allows its customers to integrate with Geneva, even if Arcesium is not providing the

Geneva license.  Am. Compl. ¶ 58.  SS&C alleges that Arcesium misappropriated

Geneva trade secrets in developing Trinity and Nautilus.  *Id.* ¶ 4.

**LEGAL FRAMEWORK**

## I.   Motion to dismiss

To withstand a motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its

face."  *Olson v. Major League Baseball*, 29 F.4th 59, 71 (2d Cir. 2022) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  On a motion to dismiss, "a district

court may consider the facts alleged in the complaint, documents attached to the

complaint as exhibits, and documents incorporated by reference in the complaint."

*United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  The

Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need detailed factual allegations, a plaintiff's obligation

to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not

do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted and

second alteration in original).

## II.   Defend Trade Secrets Act

To state a claim for trade secret misappropriation under the DTSA, "a

plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the

defendant misappropriated the trade secret."  *Medidata Sols., Inc., v. Veeva Sys.

Inc.,* 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018).

## A.     Establishing the existence of a trade secret

The DTSA defines a trade secret as information that its owner "has taken *reasonable measures* to keep . . . secret" that "derives *independent economic value*, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3) (emphases supplied).

In addition to pleading the statutory requirements of reasonable secrecy measures and independent economic value derived from secrecy, a plaintiff is required to plead its trade secrets with sufficient specificity.  "Although the Second Circuit has not expressly articulated a specificity requirement, district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated."  *Medidata*, 2018 WL 6173349, at *3.

### 1.     Specificity

Courts in this district "have accepted relatively general descriptions of alleged [trade] secrets at the motion to dismiss stage."  *Island Intell. Prop., LLC v. StoneCastle Asset Mgmt. LLC*, 463 F. Supp. 3d 490, 500 (S.D.N.Y. 2020).  Trade secrets "need not be disclosed in detail in a complaint alleging misappropriation."  *Tesla Wall Sys., LLC v. Related Companies, L.P.*, 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017).  A trade secret plaintiff is under "no obligation to reveal those secrets in the [c]omplaint simply to prove that they exist."  *Island Intell.*

*Prop., LLC*, 463 F. Supp. 3d at 500 (alteration in original).  "At the pleading stage, a plaintiff must do little more than describe the [trade] secret with *sufficient specificity* that its protectability can be assessed."  *DFO Glob. Performance Com. Ltd. (Nev.) v. Nirmel*, 2021 WL 3475596, at *4 (S.D.N.Y. Aug. 6, 2021) (alteration in original) (emphasis supplied) (internal quotation mark omitted).  "To that end, the plaintiff should include allegations regarding the information's value and the ease with which the information can be acquired."  *Id.*

However, mere allegations of the "existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue," do not give rise to a plausible trade secret claim.  *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018) (internal quotation marks omitted).  To survive dismissal, "a party alleging that it owns a trade secret must put forth specific allegations as to the information owned and its value."  *Id.* at *4.  The pleadings "must give the opposing party fair notice of what the plaintiff's claim is — including, in at least some identifying detail, the trade secret it is alleged to have misappropriated."  *Island Intell. Prop., LLC*, 463 F. Supp. 3d at 500 (internal quotation marks omitted).

## 2.    Reasonable secrecy measures

The "reasonable measures" analysis may focus on the "physical security" of a plaintiff's trade secrets but also on "who is given access, under what contractual arrangements, and with what attendant disclosures and representations."  *Turret Labs USA, Inc. v. CargoSprint, LLC*, 2021 WL 535217, at *4 (E.D.N.Y. Feb. 12,

2021).  Courts in this Circuit have ruled that reasonable secrecy measures can include "the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality." *Ad Lightning Inc. v. Clean.io, Inc.*, 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020).

### 3.    Independent economic value derived from secrecy

A plaintiff is required to allege plausibly that its trade secrets derive independent economic value from being kept secret.  Courts in this district have viewed as sufficient allegations as to a plaintiff's investment of resources, both in developing its alleged trade secrets and maintaining their secrecy, as well as allegations as to the "value and competitive advantage" of those secrets. *Universal Processing LLC v. Weile Zhuang*, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018).

Courts have viewed as sufficient allegations that a plaintiff "spent a great deal of time and money . . . developing its technology, that [plaintiff] went to great lengths to protect its confidential business information and that [plaintiff] became an industry leader." *Medidata*, 2018 WL 6173349, at *4.  Courts have dismissed claims where a plaintiff has failed to allege why or how its alleged trade secrets gave plaintiff "an economic leg up over competitors who d[id] not know or use [them]." *Investment Science, LLC v. Oath Holdings Inc.*, 2021 WL 3541152, at *4 (S.D.N.Y. Aug. 11, 2021) (internal quotation mark omitted).

## B.    Misappropriation of a trade secret

The DTSA defines misappropriation as the:

> acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret.

18 U.S.C. § 1839(5).  The DTSA definition of "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but expressly excludes "reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

To adequately allege misappropriation, a plaintiff is required to allege more than just "circumstantial datapoints . . . [which] make its allegations possible, but not plausible."  *Ad Lightning*, 2020 WL 4570047, at *3.  Absent evidence of a "concrete link" or other facts that give rise to a "plausible inference" of misappropriation, a plaintiff's allegations are "merely consistent with" misappropriation.  *Id.* at *3-4.

## III.    New York common law misappropriation of a trade secret

The requirements for stating a trade secret misappropriation claim under New York common law "are fundamentally the same as those sustaining a claim under the DTSA."  *Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (internal quotation marks omitted).  A plaintiff is required to show "(1) that it possessed a trade secret, and (2) that the defendants used that trade

secret in breach of an agreement, confidential relationship or duty, or as a result of

discovery by improper means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–

44 (2d Cir. 1999).

## DISCUSSION

## I.    Analysis

### A.    Existence of trade secrets

The court turns first to whether plaintiff alleges adequately the existence of

its trade secrets.

#### 1.    Plaintiff's position

Plaintiff argues that it alleges its trade secrets with sufficient specificity.

Am. Compl. ¶¶ 19-24.  Specifically, the alleged "Geneva Trade Secret Information"

includes:

> [T]he executable version of the Geneva software; Geneva's integration
> layer, which includes application programming interfaces ("APIs"),
> Geneva's Report Specification Language ("RSL"), and Geneva Loader;
> Geneva's database schema; Geneva's data model; sample RSL files;
> Geneva's Browse utility (which provides a visual representation of the
> database schema and the associated relationships); Geneva's Data
> Browser tool (which provides a graphic user interface for running
> queries, and a visual representation of the database schema
> corresponding to such queries); as well as documentation related to each
> item previously listed.  In addition, Geneva customer pricing constitutes
> SS&C proprietary, confidential information.

*Id.* ¶ 20.

Plaintiff provides explanatory details for the items listed.  *See, e.g., id.* ¶ 21

(explaining that the executable software is "made up of object code, which, when

executed, performs proprietary portfolio accounting functions . . . [and] stores

investment data, portfolio data, price data, transaction data, and other data in a proprietary object-oriented relational database"); *see also id.* ¶¶ 22-25 (providing additional detail for Geneva's integration layer, sample packages and database schema).

Plaintiff argues that it alleges adequately that it has taken reasonable measures to protect the secrecy of its Geneva information. *Id.* ¶¶ 26-31. Plaintiff alleges that the Geneva information is non-public and "can be accessed only by SS&C personnel and customers with valid licenses . . . subject to agreements with those customers that contain strict non-disclosure and confidentiality provisions." *Id.* ¶ 26. Plaintiff alleges also that it employs numerous security measures to protect information stored on its network, including "controls designed to protect its network from unauthorized access and unauthorized software installation," "network segmentation and firewalls used to control access to confidential information" and "procedures that restrict employee access to network folders and data sources to those which are necessary to perform their job functions." *Id.* ¶ 28. Last, plaintiff alleges that it places "extensive confidentiality designations on its proprietary documents." *Id.* ¶ 29.

Plaintiff argues that it alleges adequately that its trade secrets derive independent economic value from their secrecy. Plaintiff states that its Geneva information reflects "several decades" of development and "hundreds of millions of dollars" of investment. *Id.* ¶ 18. Plaintiff maintains that this information has "significant economic value," *id.* ¶ 19, with plaintiff continuing to "invest more than

ten million dollars annually in Geneva's development." *Id.* ¶ 18.  According to plaintiff, the Geneva information is "among the most highly confidential and sensitive trade secret information that SS&C owns," *id.* ¶ 26, and Geneva competitors could use the information to gain "a significant and unfair advantage in selling competing software and services." *Id.* ¶ 25.

> ### 2.    Defendant's position

    Defendant argues that plaintiff fails to allege the existence of any trade secrets due to insufficient specificity.  Def. Br. at 8 ("[T]he [Amended] Complaint is devoid of specific allegations identifying (i) the information comprising the trade secret; (ii) the reasonable measures taken to keep such information secret; and (iii) the value of the information." (internal quotation marks omitted)).

    Defendant argues that plaintiff's alleged trade secrets consist merely of "extraordinarily general categories of information" that are "common to *any* financial software product." *Id.* at 9 (internal quotation marks omitted); *see also Elsevier*, 2018 WL 557906, at *6 (noting that plaintiff is required to "do more than simply list general categories of information").  Defendant argues further that plaintiff's description of Geneva's features, including "object code, user interfaces, database fields, and methods for inputting and extracting data," is "simply a list of basic software components." *Id.* at 10.

    Additionally, defendant argues that plaintiff's description of its customer pricing lacks sufficient specificity, as plaintiff does not allege "some type of proprietary formula that gives [plaintiff] a unique advantage, such as a complex

pricing or trading algorithm in a financial business." *Id.* at 11 (citing *24 Seven, LLC v. Martinez*, 2021 WL 276654, at *8 (S.D.N.Y. Jan. 26, 2021)).

Defendant argues further that plaintiff fails to allege it took "reasonable measures" to keep its Geneva information secret. Def. Br. at 14. Defendant alleges that the confidentiality agreements cited by plaintiffs extend only to "*documentation* associated with Geneva," but not to the "Geneva software itself." *Id.* at 14-15. Defendant claims also that the alleged trade secrets are "not only known in the industry, but also readily available to the public through simple online searches." *Id.* at 12; *see, e.g., id.,* Exs. 4-7 (providing public information as to Geneva's features and image of database schema views).

Further, defendant argues that plaintiff failed to identify how the alleged trade secrets derive independent value from their secrecy. Def. Br. at 16. According to defendant, plaintiff provides only conclusory statements as to this point. *Id.* ("This allegation is nothing more than a formulaic recitation of an element of a DTSA claim." (citing *Inv. Sci.*, 2021 WL 3541152, at *4)). Defendant argues that plaintiff's alleged trade secret information is merely "fundamental accounting functionality" required by all portfolio accounting customers and so "is readily available to any user of . . . Geneva." *Id.*

### 3.  Conclusion

#### a.  Specificity

The court concludes that plaintiff describes its alleged trade secrets with sufficient specificity. As defendant fairly notes, courts in this district have

dismissed DTSA claims where plaintiffs "have done little more than plead broad categories of information." *Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machs. Corp.*, 2022 WL 889145, at *4 (S.D.N.Y. Mar. 25, 2022) (internal quotation mark omitted) (granting dismissal where plaintiff alleged that "customer information" constituted a trade secret without providing additional details).

However, courts in this district have accepted "relatively general descriptions of alleged [trade] secrets at the motion to dismiss stage." *Island Intell. Prop., LLC,* 463 F. Supp. 3d at 500; *see also Tesla Wall Sys.,* 2017 WL 6507110, at *9 (holding that plaintiff's pleading of categories of information including "technical data, internal pricing information, work product, research, [and] engineering designs" were sufficiently specific); *Ad Lightning*, 2020 WL 4570047, at*2 (holding as sufficiently specific plaintiff's allegations that its software program "combines synthetic audiences with live log-level user data to watch its clients' ad inventories around the clock" and "includes a reporting function that allows its publisher clients to send reports of bad ads directly to the suppliers who sent them, thereby enabling the suppliers to remove the bad ads moving forward"); *PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2021 WL 2582132, at *15 (S.D.N.Y. June 23, 2021) (holding as sufficiently specific plaintiff's descriptions of "proprietary databases and models that contain . . . core earnings forecasts" and "proprietary and confidential process, tools, and content to manage SOX compliance").

Even though plaintiff does allege a lengthy list of "general categories of information", *Elsevier*, 2018 WL 557906, at *6, plaintiff provides additional detail

regarding the composition and functionality of each of the items listed. *See, e.g.*,

Am. Compl. ¶ 21 (explaining that the executable software is "made up of object code,

which, when executed, performs proprietary portfolio accounting functions . . . [and]

stores investment data, portfolio data, price data, transaction data, and other data

in a proprietary object-oriented relational database"); *see also id.* ¶ 22 (Geneva's

"RSL database query language" is "a proprietary programming language that is

unique to Geneva and can be used to extract data by identifying specific data filed

in Geneva's proprietary data model"); *Id.* ¶ 24 ("Geneva's Browse utility . . . provides

a graphical user interface that visually illustrates the unique and proprietary

structure, sequence and organization of the Geneva database scheme and data

model"); *Id.* ("Geneva's Data Browser tool . . . provides a graphical user interface

that allows Geneva users to visually create queries and reports, and provides

corresponding source code that identifies the relevant data fields in Geneva's

database schema . . . .").

  As such, plaintiff's allegations are neither "nebulous" nor pleaded "only at the

highest level of generality." *Island Intell. Prop., LLC*, 463 F. Supp. 3d at 500

(granting dismissal where plaintiff identified its alleged trade secrets as "certain

proprietary, secret and confidential information relating to cash management and

money regulation systems"); *see also Elsevier*, 2018 WL 557906, at *6 (granting

dismissal where plaintiff alleged general categories of confidential information such

as "clinical methods," "interpretation of data," "process to assess the quality of

evidence" and "data configuration protocols and methods"). In considering the level

of detail that courts have viewed as either inadequately general or sufficiently specific, plaintiff's allegations fall into the latter category.

**b.    Reasonable secrecy measures**

The court concludes that plaintiff alleges adequately that it took reasonable measures to protect the secrecy of its alleged trade secrets.  In performing the reasonable measures analysis, "courts in this Circuit generally look to whether confidentiality or nondisclosure agreements are in place and whether the information is guarded by physical- or cyber-security protections."  *Turret Labs*, 2021 WL 535217, at *4.  Courts have ruled as adequate allegations that a plaintiff took measures such as "the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality."  *Ad Lightning*, 2020 WL 4570047, at *3; *see also Medidata*, 2018 WL 6173349, at *3 (deeming adequate allegations that plaintiff "required its customers, partners, vendors and employees to enter into nondisclosure agreements," "prohibited its employees from making unauthorized email transfers of company documents and from retaining company documents after their employment ended" and "restricted access to information to those with a need to know by using passwords and . . . two-factor authentication").

Plaintiff alleges that the Geneva information "can be accessed only by SS&C personnel and customers with valid licenses . . . subject to agreements with those customers that contain strict non-disclosure and confidentiality provisions."  Am.

Compl. ¶ 26.  Plaintiff alleges further that it employs "controls designed to protect

its network from unauthorized access and unauthorized software installation,"

"network segmentation and firewalls used to control access to confidential

information" and "procedures that restrict employee access to network folders and

data sources to those which are necessary to perform their job functions." *Id.* ¶ 28.

Last, plaintiff alleges that it places "extensive confidentiality designations on its

proprietary documents." *Id.* ¶ 29.  Plaintiff's descriptions of its secrecy measures,

which include both "confidentiality [and] nondisclosure agreements" and "physical-

[and] cyber-security protections," allege adequately that plaintiff took reasonable

measures to protect the secrecy of its Geneva information. *Turret Labs*, 2021 WL

535217, at *4.

### c.    Independent economic value derived from secrecy

The court concludes that plaintiff alleges adequately that the Geneva

information derives independent economic value from its secrecy.  In general, courts

consider whether a plaintiff has invested significant resources in developing its

alleged trade secrets and maintaining their secrecy, as well as whether a plaintiff's

trade secrets provide "value and competitive advantage." *Universal Processing*,

2018 WL 4684115, at *3 (dismissing "vague" allegations that plaintiff's alleged

trade secrets formed "the guideline and core" of plaintiff's marketing initiatives); *cf.*

*Ad Lightning*, 2020 WL 4570047, at *3 (deeming as sufficient plaintiff's claim that

the secrecy of its alleged trade secrets helped plaintiff "maintain its competitive

advantage in the market").

Courts have viewed as adequate allegations that a plaintiff "spent a great deal of time and money . . . developing its technology, that [plaintiff] went to great lengths to protect its confidential business information and that [plaintiff] became an industry leader." *Medidata*, 2018 WL 6173349, at *4; *see also Bancorp Servs., LLC v. Am. Gen. Life. Ins. Co.*, 2016 WL 4916969, at *11 (S.D.N.Y. Feb. 11, 2016) (deeming as adequate allegations that plaintiff's trade secrets were "worth hundreds of millions of dollars in fees" and that plaintiffs "spent five years and $10 million to develop" the trade secrets). Courts have dismissed claims where a plaintiff has failed to allege why or how its alleged trade secrets gave plaintiff "an economic leg up over competitors who d[id] not know or use [them]." *Inv. Sci.*, 2021 WL 3541152, at *4 (dismissing plaintiff's "bare" allegation that it "derive[d] independent economic value" from trade secret information not known to plaintiff's competitors).

Plaintiff alleges that it has spent "several decades" and "hundreds of millions of dollars" in developing, maintaining and updating Geneva to be a "highly competitive portfolio accounting product." Am. Compl. ¶ 18. Plaintiff alleges that it derives "significant economic value" from its trade secrets, *id.* ¶ 19, and continues to "invest more than ten million dollars annually in Geneva's development." *Id.* ¶ 18. Plaintiff alleges further that the Geneva information is "among the most highly confidential and sensitive trade secret information" that plaintiff owns and that Geneva competitors could use the information to gain "a significant and unfair advantage in selling competing software and services." *Id.* ¶¶ 25-26. These are

more than just bare allegations and adequately plead that the Geneva information is valuable, at least in part, because it is secret. As such, plaintiff has pleaded adequately each of the three components necessary to allege the existence of a trade secret and has satisfied the first prong of the DTSA's requirements.

### B.    Misappropriation

Having determined that plaintiff alleges adequately the existence of its trade secrets, the court turns next to whether plaintiff alleges adequately that defendant misappropriated plaintiff's trade secrets.

Plaintiff alleges that defendant misappropriated plaintiff's trade secrets by using the Geneva information "(i) to create [Arcesium's] own competing portfolio accounting software, Trinity, that provides features, reporting, and functionality in the same manner as Geneva, (ii) to develop interfaces between Arcesium's platform and Geneva . . . and (iii) to poach . . . Geneva customers." Am. Compl. ¶ 47.

Defendant argues generally that plaintiff "fails to allege any actual misappropriation" of any kind because plaintiff relies solely on "speculation and the mischaracterization of certain documents." Def. Br. at 1. Defendant argues further that plaintiff fails to allege facts "establishing *how* Arcesium misappropriated any trade secrets." *Id.* at 17. Defendant asserts that, absent such facts, the "Court and Arcesium are left to guess as to the nature of the alleged misappropriation, including which secrets allegedly were stolen; how they were used; and how (if at all) the purportedly stolen information appears in Arcesium's software." *Id.*

In evaluating whether plaintiff alleges trade secret misappropriation adequately, this court is to review plaintiff's allegations in accordance with the following guidelines.  A plaintiff is required to "plead facts sufficient to raise an inference that a defendant improperly used a trade secret, but need not specifically plead that the defendant used the trade secrets."  *Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 353 (S.D.N.Y. 2013).  Further, a plaintiff is required to allege "factual content that allows the court to draw the *reasonable* inference that the defendant is liable for the misconduct alleged," an inference that requires "*more than a sheer possibility* that [the] defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (emphases supplied).  To do so, a plaintiff is required also to allege more than mere "circumstantial datapoints . . . [which] make [plaintiff's] allegations *possible, but not plausible*." *Ad Lightning*, 2020 WL 4570047, at *3 (emphasis supplied).  Absent evidence of a "concrete link" or other facts that give rise to a "plausible inference" of misappropriation, a plaintiff's allegations are "merely consistent with" misappropriation.  *Id.* at *3-4.

SS&C supports its allegation of trade secret misappropriation with three chief categories of evidence.  The court addresses each in turn.

### 1.  Evidence that Arcesium *copied Geneva functionality* in developing Trinity

The first type of evidence that plaintiff provides seeks to buttress that defendant misappropriated Geneva information to "mimic Geneva's capabilities" in defendant's competing software, Trinity.  Am. Compl. ¶ 49.  Plaintiff claims as evidence of defendant's improper use that Trinity has the same "functionality,

methodologies and reports" as Geneva. *Id.* Plaintiff alleges further that, while Trinity was still under development, Arcesium's technical personnel "circulated a spreadsheet of [Trinity's] shortcomings" as well as "action items" to have Trinity "mimic" Geneva's functionality. *Id.* ¶¶ 51-52; Arcesium Tech. Spreadsheet, ECF No. 42-3 (internal Arcesium document comparing Trinity and Geneva functionalities, with "Action Item[s]" listed for improving Trinity functionalities relating to "PnL" reports, "taxlot" visibility and "Accrued Interest" reports).

Defendant argues that the functional similarities between Geneva and Trinity are basic components of all accounting software, rather than indicators of misappropriation. Def. Br. at 18. Defendant asserts that "[a]ny software that competes with Geneva necessarily encompasses similar functions and capabilities because the software is built to enable customers to comply with generally accepted accounting principles." *Id.* Defendant argues further that the "spreadsheet of shortcomings" that contained "Action Item[s]" for improving Trinity, referred only to basic concepts, not protectible information. *Id.* at 17. In particular, the references to Geneva referred only to basic accounting concepts that any portfolio accounting software would have, such as "accrued interest," "tax lots" and "data fields." *Id.* Defendant argues also that plaintiff fails to identify "any [Geneva] functionality that is not widely known or recognized in the industry or how those features made their way into Arcesium's platform." Def. Reply Br. at 9.

Courts in this district have declined to draw a reasonable inference of misappropriation where a plaintiff alleged that "general financial terms" that

appeared in plaintiff's product appeared also in defendant's competing product. *Inv. Sci.*, 2021 WL 3541152, at *5 ("[G]eneral financial terms . . . are quintessential 'circumstantial data points — enough to make [plaintiff's] allegations possible, but not plausible.'") (quoting *Ad Lightning*, 2020 WL 4570047, at *3);[1] *see also Exceed Holdings LLC v. Chi. Bd. Options Exch. Inc.*, 2018 WL 4757961, at *5 (S.D.N.Y. Sept. 30, 2018) ("It is simply insufficient to allege that [defendant's] products utilized general strategies that are publicly available without providing any explanation as to what aspects of [plaintiff's] proprietary information were incorporated.  On these allegations, the Court cannot infer that [defendant's] products were made possible by virtue of" trade secret misappropriation.).[2]  Further, the Second Circuit has held that "matters of general knowledge in an industry . . . cannot form the basis of [a] trade secret misappropriation claim." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 WL 463884, at *12 n.10 (S.D.N.Y. Feb. 20, 2008) (citing *Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962)).

---

[1] Plaintiff Investment Science alleged that several financial terms and data elements in its product later appeared in defendant Oath's product, including "Debt to Equity Ratio," "Revenue," "dividends" and "Recent company news."  First Amended Complaint at ¶ 79; *Inv. Sci.*, No. 1:20-CV-08159 (S.D.N.Y. Aug. 11, 2021), ECF No. 31.  Investment Science argued that these items were "trade secrets intended to help investors make sound decisions" but the Court instead characterized them as "obvious and common financial metrics used to gauge the overall value and health of a company." *Inv. Sci.*, 2021 WL 3541152, at *2 n.1.

[2] The Court in *Exceed Holdings* ruled that plaintiff's allegations were "simply inadequate to withstand a motion to dismiss" because plaintiff failed to offer "any elaboration or explanation that would permit the Court to reasonably infer that the similarities [between plaintiff's and defendant's products] were the result of the misappropriation." *Exceed Holdings*, 2018 WL 4757961, at *6.

Here, plaintiff alleges that defendant copied from Geneva a list of features that can be characterized fairly as general accounting principles used to maintain accurate financial records and monitor investments. Inclusion in Trinity of these general accounting principles involves the utilization of precisely the sort of "general financial terms" and "matters of general knowledge" that courts in this circuit have ruled cannot form the basis of a plausible misappropriation claim. *See Inv. Sci.*, 2021 WL 3541152, at *5; *Sit-Up Ltd.*, 2008 WL 463884, at *12 n.10. Following court precedent, the court concludes that these general accounting principles do not allow the court to draw a reasonable inference of misappropriation.

Additionally, courts in this Circuit have declined to draw a reasonable inference of misappropriation even where a defendant launched a product that was "materially identical in form, function, and operation" to plaintiff's product. *Core SWX, LLC v. Vitec Grp. US Holdings, Inc.*, 2022 WL 3588081, at *2, 10 (E.D.N.Y. July 14, 2022) (holding that plaintiff's allegations were "circumstantial datapoints" and were not sufficient to "plausibly claim that the purported trade secret was acquired through improper means").

Here, plaintiff does not even allege that Trinity is materially identical to Geneva, only that Trinity contains "similar functionality, methodologies and reports." Am. Compl. ¶ 49. Plaintiff's allegations of similar functionality are mere "circumstantial datapoints . . . [which] make [plaintiff's] allegations possible, but not plausible." *Ad Lightning*, 2020 WL 4570047, at *3. Therefore, plaintiff's

allegations of similar functionality do not allow the court to draw a reasonable inference of misappropriation.

Courts in this district have drawn a reasonable inference of misappropriation where a plaintiff alleged that defendant's product contained not only similar functionality, but also features that were unique and the focus of confidential research and development efforts. *See Medidata*, 2018 WL 6173349, at *4 (concluding that allegations of software misappropriation were plausible where defendant's products contained "specific features and functionality that had been the focus of [plaintiff's] confidential research and technology initiatives").

Had plaintiff alleged that Trinity contained features that were unique to Geneva or the product of confidential research and development efforts, that allegation might have supported a reasonable inference of misappropriation. However, plaintiff makes no such allegation. As such, plaintiff does not allege any facts that would allow the court to draw a reasonable inference that defendant copied Geneva's functionality through misappropriation.

### 2.    Evidence that Arcesium developed Trinity on a *truncated timeline* made possible only by misappropriation

The second type of evidence that plaintiff provides is that defendant could not have developed Trinity as rapidly as it did absent defendant's misappropriation of the Geneva information. Am. Compl. ¶ 54. Plaintiff relies primarily on June 2020 declarations by defendant's CEO, Gaurav Suri, and Head of Technology, Bryan Dougherty, submitted in Arcesium's antitrust suit against SS&C, stating that it would take defendant "12 months, at a minimum" to transition away from Geneva

to another provider's portfolio accounting software.  *Id.*; Declaration of Gaurav Suri
("Suri Decl."), *Arcesium, LLC v. Advent Software, Inc.*, No. 1:20-cv-04389 (S.D.N.Y.
Mar. 31, 2021), ECF No. 23; Declaration of Bryan Dougherty ("Dougherty Decl."),
*Arcesium, LLC v. Advent Software, Inc.*, No. 1:20-cv-04389 (S.D.N.Y. Mar. 31, 2021),
ECF No. 25.  Plaintiff argues that defendant's internal software development would
"necessarily take even longer" than the quoted 12-month transition period and
alleges that this statement is an admission that defendant "was not close to
completing the development" of Trinity as of June 2020.  Am. Compl. ¶ 54.

       Defendant disputes plaintiff's allegation that Arcesium used Geneva to
accelerate its development of Trinity.  Defendant argues that the two declarations
from Arcesium executives cited by plaintiff do not "set out the timeline of
Arcesium's software development" and instead address only "the time that it would
take to transition clients who *already were using* Geneva to another software
solution."  Def. Br. at 22.

       In the Suri declaration, Suri states that "[o]nce Geneva or any other portfolio
accounting software is integrated into an investment manager's systems, it is
extremely expensive, time-consuming and disruptive to replace it with a different
portfolio accounting solution.  Transitioning from Geneva to different portfolio
accounting software would take 12 months, at a minimum . . . ."  Suri Decl. ¶
8.  Suri elaborates that "switching portfolio accounting software is like doing a heart
transplant while the patient is still trying to go about his or her daily
business."  *Id.*

In the Dougherty declaration, Dougherty states that "it would not be unusual for it to takes [sic] months or even more than a year to transition [from] Geneva . . . and replace it with another accounting software solution."  Dougherty Decl. ¶ 18.  Dougherty states further that if "not transitioned seamlessly, the customer can lose the ability to monitor trading activities regularly and risk dangerous interruptions that prevent them from being able to meet collateral maintenance, regulatory, and other business critical obligations."  *Id.*

Defendant argues further that, even accepting plaintiff's erroneous interpretation of the two declarations, it is not possible to infer plausibly that Arcesium's development timeline was unusually rapid absent "any allegation regarding the *typical* timeline for developing portfolio accounting software."  Def. Br. at 22.

On a motion to dismiss, "a district court may consider . . . documents incorporated by reference in the complaint."  *United States ex rel. Foreman*, 19 F.4th at 106.  "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control[s], and the court need not accept the allegations in the complaint as true."  *Poindexter v. EMI Record Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) (citing *Barnum v. Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994)).

Based on these decisions, the pertinent documents produced by the parties — in this case, the June 2020 declarations — control, not plaintiff's allegations.  The declarations do not support a reasonable inference of misappropriation because they

address only the estimated time it would take *existing Arcesium clients* that had

integrated Geneva into their systems to de-integrate Geneva from their systems

and rewire their existing applications to integrate with a different portfolio

accounting software.  The declarations discuss only the difficulties specific to

*switching* from one portfolio accounting software to another, not the difficulties of

*developing* a portfolio accounting software.  Further, the declarations do not provide

any information regarding the status or estimated timeline of defendant's

development of Trinity.  Plaintiff's assertion that defendant's development of

Trinity would "necessarily take even longer" than the transition period discussed in

the declarations is conclusory.  Am. Compl. ¶ 54.

  Courts in this district have drawn a reasonable inference of misappropriation

where a plaintiff alleged that a defendant lacked the technical expertise or requisite

experience in the market such that defendant's independent development of its

competing product would be implausible.  For instance, in *Medtech Prod. Inc. v.

Ranir, LLC*, the court ruled that plaintiff plausibly alleged misappropriation where

defendant had "no experience in the . . . market, [yet] was able to rush a [product] to

the market, without going through any development process," in only seven months

instead of the normal "years of experimenting."  *Medtech Prod. Inc. v. Ranir, LLC*,

596 F. Supp. 2d 778, 790, 805 (S.D.N.Y. 2008).[3]

---

[3] In *Medtech Prod.*, plaintiff alleged that the normal development process in the
dental protector market was "time-consuming and expensive," involving "evaluation
and vetting processes" necessitating working with "suppliers, designers,
consultants, and legal advisors."  *Medtech Prod.*, 596 F. Supp. 2d at 788.  Plaintiff

Similarly, in *Medidata*, the court ruled that plaintiff alleged plausibly that defendant misappropriated plaintiff's trade secrets to "introduce competing products in record time despite [defendant's] lack of experience in developing" clinical trial management software. *Medidata*, 2018 WL 6173349, at *4.[4]

By contrast, SS&C makes no similar allegations as to defendant's possible lack of expertise. Plaintiff does not allege any facts suggesting that defendant was incapable of independently developing Trinity in the timeframe that it took. In fact, plaintiff acknowledges that defendant spent several years developing Trinity, Am. Compl. ¶ 3, and that defendant had "extensive experience and familiarity" with portfolio accounting software dating back to defendant's founding in 2014. *Id.* ¶ 33. In view of the *Medtech Prod.* and *Medidata* decisions, SS&C's allegations do not allow the court to draw a reasonable inference that the development timeline of Trinity was truncated as a result of any misappropriation. Plaintiff's allegations regarding the June 2020 declarations are "circumstantial datapoints . . . [which] make [plaintiff's] allegations possible, but not plausible." *Ad Lightning*, 2020 WL 4570047, at *3.

---

Medtech alleged that defendant was able to bypass the normal development process and create a competing product on an "expedited basis" by receiving inside information from two former Medtech employees who "had extensive knowledge of Medtech's business and . . . production process." *Id.* at 789-790.

[4] In *Medidata*, plaintiff launched its product "12 years after" first entering the market and, in developing its product, relied "upon the knowledge of an acquired company that previously made the product." *Medidata*, 2018 WL 6173349, at *4. By contrast, defendant lacked any experience in developing clinical trial management software. *Id.*

### 3.    Evidence that Arcesium engaged in a *cover up* of its alleged trade secret theft

The third type of evidence that plaintiff provides relates to its allegation that defendant deliberately tried to hide its reliance on the Geneva information to develop Trinity.  Am. Compl. ¶ 89.  Plaintiff relies primarily on a June 2019 email thread to argue that defendant engaged in a cover-up by purging references to Geneva from internal documentation concerning technical requirements for Arcesium's platform.  *Id.* ¶ 55.

In the June 2019 email thread, two Arcesium senior technical staff, Bryan Dougherty and Girish Acharya, discussed how to write technical requirements for Arcesium's platform.  *See* June 2019 Email Thread Regarding Arcesium Technical Requirements ("Tech. Req. Email Thread"), ECF No. 42-8.  Plaintiff relies heavily on the following statement by Dougherty: "If it would help, I'd be happy to walk through a few examples on how to remove references to Geneva while still expressing what your team needs."  *Id.* at ARCESIUM0000000023.  Plaintiff alleges that Dougherty's statement is evidence of a "blatant and willful effort to cover up" defendant's theft and "hide [defendant's] reliance on the Geneva Trade Secret Information in formulating Arcesium's technical requirements, user stories and specifications."  Am. Compl. ¶ 56.

Defendant disputes plaintiff's use of the June 2019 email thread as evidence of an attempt to cover up misappropriation.  Defendant notes that, in the same email, Dougherty stresses the need to "build [Arcesium's] platform to be independent of Geneva" and instructs Acharya to "state [Arcesium's] requirements

independent of what Geneva does." Def. Br. at 21; Tech. Req. Email Thread at
ARCESIUM0000000023. Defendant argues that the email thread shows that
Arcesium employees recognized the need to respect plaintiff's intellectual property
and "undercuts, rather than supports" plaintiff's claims. Def. Br. at 21.

Defendant cites to several other Arcesium documents to show further that it
recognized and took steps to avoid misappropriating SS&C's intellectual
property. *Id.* (Arcesium employees recognized: (1) that Arcesium "no longer had a
[development] license for Geneva"; (2) that "it would not be appropriate for
Arcesium to produce or use certain loader formats" belonging to plaintiff; and (3)
that "it might be necessary for a customer to hire a third-party vendor" to avoid
unauthorized access to Geneva (internal quotation marks omitted)).

In the same email, Dougherty stresses that Arcesium's "platform screens
should not merely pass through what Geneva does." Tech. Req. Email Thread at
ARCESIUM0000000023. Dougherty explains that "rather than saying 'This is how
Geneva does it, so [Arcesium] should do it that way too' . . . [the Arcesium team]
should say 'I need X in order to do task Y.'" *Id.* In the next email, Acharya
responds with his attempt to describe the technical requirements for functions such
as "Tax Lot loading," "Cash Ledger" and "Realized Gain Loss Report" without
references to Geneva. *Id.* at ARCESIUM0000000022. Acharya states also that he
is "not proposing [that Arcesium] should be doing similar to what Geneva does." *Id.*
Dougherty then responds to Acharya as follows: "Yes! This is what I am looking for

. . . . When expressed this way it is easy to see how the requirements can appeal to a wide range of stakeholders and use cases." *Id.*

As noted above, where "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control[s], and the court need not accept the allegations in the complaint as true." *Poindexter*, 2012 WL 1027639, at *2.

Dougherty's statement regarding removing references to Geneva, read in the context of both the email in which it is located and the full email thread, does not suggest a concerted effort by defendant to cover up its misappropriation of Geneva information. Consistent with the rest of the exchange, the statement indicates that Dougherty sought to have Arcesium's development team think independently of Geneva and develop software with an understanding of why certain functionalities were needed and how they would be used. Further, the June 2019 email thread does not plausibly support the conclusion that Arcesium employees were developing Trinity through misappropriation of Geneva information. Rather, the June 2019 email thread suggests that defendant expended additional effort to avoid plagiarizing Geneva. In sum, plaintiff does not allege any facts that would allow the court to draw a reasonable inference that defendant misappropriated Geneva information and attempted to cover up its actions.

### 4.    Conclusion

For the foregoing reasons, the court concludes that plaintiff does not allege facts that might support a reasonable inference that defendant misappropriated

Geneva information. As such, plaintiff fails to plead adequately the second prong of the DTSA's requirements.

Accordingly, plaintiff's DTSA claim is dismissed with prejudice.

### C.   Common law misappropriation claims

The requirements for stating a trade secret misappropriation claim under New York common law "are fundamentally the same as those sustaining a claim under the DTSA." *Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (internal quotation marks omitted). For "substantially the same reasons" that plaintiff fails to adequately plead a DTSA claim, plaintiff fails also to adequately plead a claim of trade secret misappropriation under New York law. *See Inv. Sci.*, 2021 WL 3541152, at *5 (dismissing New York law misappropriation claims where plaintiff's DTSA claims were also dismissed).

Accordingly, plaintiff's common law trade secret misappropriation claim is dismissed with prejudice.

### D.   Remaining state-law claims

Additionally, plaintiff brings several state-law claims alleging unfair competition and breach of contract. *See* Am. Compl. ¶¶ 105-123. "Federal district courts have supplemental jurisdiction over state-law claims 'that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .'" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 121-122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(a)). A district court "may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims

over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Given that the court dismisses plaintiff's federal DTSA and common law trade secret misappropriation claims, the court declines supplemental jurisdiction over plaintiff's remaining state-law claims. In deciding whether to exercise supplemental jurisdiction, a district court should weigh "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). The Supreme Court has held that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7; *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law . . . . [I]f the federal claims are dismissed . . . the state claims should be dismissed as well . . . without prejudice and left for resolution to state tribunals."). Following this guidance, the court declines to exercise supplemental jurisdiction over plaintiff's non-trade secret state-law claims and dismisses those claims without prejudice to refiling in state court. Because the court declines to exercise supplemental jurisdiction, it is not necessary to reach the other grounds for dismissal raised by defendant.

### E. Arcesium's Counterclaims

The dismissal of plaintiff's federal cause of action means that the court "has dismissed all claims over which it has original jurisdiction" and "may decline to

exercise supplemental jurisdiction" over defendant's purely state-law counterclaims. 28 U.S.C. § 1367(c)(3). For the same reasons as apply to plaintiff's non-trade secret state-law claims, the court declines to exercise supplemental jurisdiction over defendant's counterclaims. As such, it is not necessary for the court to reach whether defendant establishes adequately subject matter jurisdiction over its counterclaims nor any other grounds for dismissal raised by plaintiff. Defendant's counterclaims are dismissed without prejudice to refiling in state court.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss and plaintiff's motion to dismiss counterclaims are GRANTED. The Clerk of Court is respectfully directed to close the case and terminate all open motions in the case.

SO ORDERED.

/s/ Timothy M. Reif

_____

Dated: December 20, 2024
New York, New York

Timothy M. Reif, Judge
United States Court of International Trade
*Sitting by Designation*
United States District Court for the
Southern District of New York